UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MARGARET ORCUTT,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>　　　　　Defendants. | No. ED CV 04-889-PLA<br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on July 21, 2004, seeking review of the Commissioner's denial of her applications for Disability Insurance and Supplemental Security Income benefits. The parties filed a Consent to proceed before the undersigned Magistrate Judge on August 19, 2004. Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 20, 2005, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on September 10, 1956. [Administrative Record ("AR") at 70, 550.] Plaintiff has two years of college education and past relevant work experience as, among other things, a caregiver and a snack bar attendant. [AR at 175, 180.]

On August 7, 2003, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income payments.[1] [AR at 70-72, 173-82, 550-52.] Plaintiff alleged disability due to depression, anxiety and mood disorder, fibrous and arthritic changes, and nerve pain in both arms. She claimed that she has been unable to work since April 20, 2001. [AR at 70, 174, 550.] After her applications were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on December 19, 2003, at which plaintiff appeared with counsel and testified on her own behalf. A vocational expert and a medical expert also testified. [AR at 553-85.] On January 29, 2004, the ALJ determined that although plaintiff had impairments that were severe and she could not perform her past relevant work, she still retained the residual functional capacity[2] to perform a significant number of jobs in the national economy. [AR at 18-20.] Thus, the ALJ concluded that plaintiff was not disabled. [AR at 12-20.]

When the Appeals Council denied review on June 5, 2004, the ALJ's decision became the final decision of the Commissioner. [AR at 5-7.]

/
/
/
/

## III.

---

[1] Plaintiff previously filed applications for Supplemental Security Income payments on December 28, 2001, as well as in 1996 and 1997. [AR at 12.]

[2] Residual functional capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in

substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ concluded that plaintiff has not engaged in any substantial work activity since the alleged onset of her disability. [AR at 13, 18.] At step two, the ALJ concluded that plaintiff's musculoskeletal impairments, dysthymia and personality disorder were severe. [AR at 15, 18.] At step three, the ALJ found that plaintiff's impairments do not meet or equal the requirements of any of the impairments in the Listing. [AR at 15, 19.] The ALJ found that plaintiff has the residual functional capacity to perform a full range of light work[3] activity. [AR at

---

[3] Light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg

16-17.] At step four, the ALJ concluded that plaintiff is unable to perform her past relevant work. [Id.] At step five, the ALJ concluded that based on plaintiff's residual functional capacity, age, education, and work experience, there is a significant number of jobs she can perform in the national economy. [Id.] Thus, the ALJ found plaintiff not disabled. [AR at 18-20.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ did not properly develop the record, did not properly evaluate the alleged side effects of her medication, and did not appropriately consider the lay witness testimony. For the reasons discussed below, the Court respectfully disagrees with plaintiff, and affirms the Commissioner's decision.

### A.   THE ALJ'S DUTY TO DEVELOP THE RECORD

Plaintiff contends that the ALJ failed in her duty to develop the record in asserting that there is no evidence to support plaintiff's claim of disabling depression and anxiety, and yet not obtaining plaintiff's records from the Phoenix Clinic. Joint Stipulation, at 3-4. At the hearing, plaintiff testified that she was receiving psychiatric treatment at the Phoenix Clinic in San Bernardino, where she goes once a month "for medication." She had not received counseling since early 2002, but her psychiatrist "was putting [her] on the list for group therapy." [AR at 561.]

Although plaintiff bears the burden of proving disability, the ALJ in a social security case has an independent "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)). This duty extends to the represented as well as to the unrepresented claimant. Id.

---

controls." 20 C.F.R. §§ 404.1567(b) and 416.967(b). In particular, the ALJ concluded that plaintiff "is precluded from forceful gripping or grasping with her upper extremities and no overhead work with her right arm. She is further limited to simple, repetitive tasks and no public interaction." [AR at 19.]

1   The ALJ's responsibility derives in part from the basic premise that disability hearings are
2   not adversarial in nature. See Sims v. Apfel, 530 U.S. 103, 110-111, 120 S.Ct. 2080 (2000). It
3   is also based on the regulatory directive that, in an administrative hearing, the ALJ "looks fully into
4   the issues." 20 C.F.R. §§ 404.944 and 416.1444. See Pearson v. Bowen, 866 F.2d 809, 812 (5th
5   Cir. 1989)(recognizing ALJ's "duty of 'full inquiry' under § 416.1444").

6   As part of this duty, the ALJ has an obligation to take reasonable steps to ensure that
7   issues and questions raised by medical evidence, particularly evidence from treating physicians,
8   are addressed so that the disability determination is fairly made on a sufficient record of
9   information, both favorable and unfavorable to the claimant. See Tidwell v. Apfel, 161 F.3d 599,
10  602 (9th Cir. 1998, as amended Jan. 26, 1999); Cox v. Califano, 587 F.2d 988, 991 (9th Cir.
11  1978); see also 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3)(providing steps to obtain additional
12  evidence where medical evidence is insufficient to determine whether claimant is disabled); 20
13  C.F.R. §§ 404.1512(e) and 416.912(e) (providing measures for obtaining additional information
14  from treating doctors). Where it is necessary to enable the ALJ to resolve an issue of disability,
15  the duty to develop the record may require consulting a medical expert or ordering a consultative
16  examination. See 20 C.F.R. §§ 404.1519a and 416.919a; Armstrong v. Commissioner, 160 F.3d
17  587, 590 (9th Cir. 1998) (where there were diagnoses of mental disorders prior to the date of
18  disability found by the ALJ, and evidence of those disorders even prior to the diagnoses, the ALJ
19  was required to call a medical expert to assist in determining when the plaintiff's impairments
20  became disabling); Pearson, 866 F.2d at 812-13.

21  On the other hand, the ALJ is not obliged to undertake the independent exploration of every
22  conceivable condition or impairment a claimant might suffer. An ALJ does not fail in her duty to
23  develop the record by not seeking evidence or ordering further examination or consultation
24  regarding a physical or mental impairment if no medical evidence indicates that such an
25  impairment exists. See Pearson, 866 F.2d at 812 (requiring that claimant must "raise a suspicion
26  concerning such an impairment" before ALJ is required to discharge duty of full inquiry by ordering
27  a consultative examination); Breen v. Callahan, 56 Soc. Sec. Rep. Ser. 340, 1998 WL 272998,
28  at *3 (N.D. Cal. May 22, 1998)(noting that, in the Ninth Circuit, the ALJ's obligation to develop the

record is triggered by "the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision").

Here, the ALJ did not err in not obtaining records from the Phoenix Clinic, as the record was neither ambiguous nor inadequate to permit a full and proper evaluation of plaintiff's mental impairment. The ALJ accurately and thoroughly discussed plaintiff's mental impairment, noting, among other things, plaintiff's 1997 hospitalization for posing a harm to herself and others, her diagnoses of chronic dysthymia, double depression, and dependent personality traits, her out-patient record for treatment of depression, anxiety and irritability, her depressive episodes, and her 2003 hospitalization for suicidal ideation. The ALJ also discussed plaintiff's various Global Assessment of Functioning scores, ranging from a low of 20 up to 60,[4] and a 2002 psychiatric evaluation in which it was concluded that plaintiff could perform simple work. [AR at 14; see AR at 265-70, 387-95, 413-17, 465-74.] Rather than ignore or fail to obtain evidence of plaintiff's mental condition, the ALJ instead concluded that plaintiff has severe mental impairments, including dysthymia and personality disorder, and that she functions better when taking her medication. [AR at 15, 18.] Indeed, the evidence supports these conclusions.

In October, 1996, plaintiff was evaluated by a psychiatrist, who diagnosed her with a history of major depression, in partial remission, and a GAF score of 65.[5] [AR at 301-04.] Plaintiff was hospitalized in June, 1997, for a psychiatric episode. At the time, she was a patient at Long Beach Mental Health, and was taking psychiatric medications. [AR at 265-66.] The discharge summary

---

[4] A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), p. 32 (4th Ed. 2000). A GAF score of 11-20 indicates some danger of hurting self or others, or the occasional failure to maintain minimal personal hygiene, or gross impairment in communication. A GAF score from 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. See DSM-IV, at 34.

[5] A GAF score from 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See DSM-IV, at 34.

notes that plaintiff had six suicide attempts from the age of 16 through December, 1996. [AR at 267.] Her medications had run out at the time of her hospitalization. [AR at 267.] She was positive for cocaine at the time of her admission, and admitted cocaine and marijuana use, as well as binge drinking. [AR at 267.] Plaintiff was not seen as a danger to herself or others at the time of discharge. [AR at 269.] She was diagnosed with dysthymia, chronic, with periods of double-depression, rule out cocaine induced depression, and a GAF score of 60. The prognosis was "fair." [AR at 270.]

Plaintiff attended multiple counseling sessions at the County of Orange Health Care Agency from approximately November, 1997, through March, 1999. She was prescribed medications during that time [AR at 335-36] that were described as "helpful" and "effective." [AR at 328-32.] As of October, 1998, it was indicated that the medication "seems to work well," and plaintiff had no depression. [AR at 328-29.] The medication continued to be helpful as of March, 1999. [AR at 327.]

Plaintiff was treated at the Rio Hondo Mental Health Center starting in March, 2001. At that time, she complained of "feeling drowsy" when she took her morning dose of medication, and had not been taking that dose. [AR at 395.] She was diagnosed in April, 2001, with major depression, recurrent, and alcohol and cannabis abuse. [AR at 394.] Plaintiff denied depression in June, 2001, as well as suicidal ideation. [AR at 393.] In September, 2001, she had no psychosis or suicidal ideation, and it was noted that she was experiencing no side effects from her medications. [AR at 392.] There were also no side effects noted in October, 2001, December, 2001, and March, 2002. [AR at 387, 388, 390, 391.]

In April, 2002, plaintiff was examined by Dr. Barry Edelman, a psychiatrist. Plaintiff noted that she sleeps well except when she is in physical pain, is able to dress and bathe herself, does household chores, errands, and shopping, and is able to drive and cook. [AR at 414.] She did not report regular use of alcohol or recent use of illicit drugs. [AR at 414.] Dr. Edelman diagnosed plaintiff with major depressive episode, moderate and chronic, and a GAF score of 60. [AR at 416-17.] He concluded that plaintiff would be able "to understand, remember, and follow simple instructions," but would have difficulty with complex instructions. She could "maintain

concentration on simple work," and would be "able to interact sufficiently with peers and supervisors." He recommended that she not do work that would require much contact with the public, however. [AR at 417.]

In May, 2002, Dr. Charles Stone, a state agency psychiatrist, concluded that plaintiff had mild degrees of limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace. [AR at 430.] He further concluded that she was moderately limited in her ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to interact appropriately with the general public. [AR at 434-35.] He opined that she is capable of simple repetitive tasks with minimal public contact. [AR at 436.]

During a physical examination at the Arrowhead Regional Medical Center in October, 2002, it was believed that plaintiff was exhibiting drug seeking behavior. [AR at 487.] A psychiatric evaluation conducted during a hospitalization in July, 2003, indicated that plaintiff was brought to the Arrowhead facility by the police as a danger to herself and others, and she had not been taking her prescribed medications. [AR at 472.] She was diagnosed with major depressive disorder, recurrent, severe without psychosis, and a GAF score of 20. [AR at 473.] When discharged on July 21, 2003, she was diagnosed with bipolar disorder, not otherwise specified, and amphetamine abuse, with a GAF score of 45.[6] It was noted that she was positive for amphetamines when admitted to the hospital. [AR at 465-66.]

The medical expert testified that plaintiff suffers from chronic dysthymia, which under certain circumstances may flare up, and a personally disorder, not otherwise specified. He concluded that she has minimal difficulties in activities of daily living, and mild limitations in social functioning that could rise to moderate difficulties in complex tasks. He indicated that plaintiff is restricted to simple tasks, but can do repetitive tasks. [AR at 577.] She needs to avoid intense

---

[6] A rating of 41-50 on the GAF scale indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See DSM-IV at 34.

interpersonal work, and is able to do simple work when she is compliant with her medication. [AR at 578.]

The ALJ concluded that "there is no evidence that [plaintiff's] depression has more than a minimal effect upon her ability to engage in work-related activities. She is noted to be non-compliant with her medications on several occasions, resulting in a deterioration of her condition." [AR at 16.] The ALJ adopted the medical expert's opinions, finding them to be "well reasoned and consistent with the medical evidence of record." [AR at 15.]

The fact that the ALJ did not seek the records from Phoenix Clinic does not require remand. The evidence presented by plaintiff at most shows that she was receiving medications at the Clinic, but was not involved in counseling at the time of the hearing. The records considered by the ALJ indicate that plaintiff functioned better when taking her medications -- which she was receiving at the Clinic -- and was able to perform the simple work related tasks set forth by the ALJ. She could take care of herself, run errands, shop and cook. Plaintiff has not met her burden of proving disability, or of showing that the records of Phoenix Clinic would have revealed anything other than the limitations that the ALJ found to be established by the record. See 20 C.F.R. §§ 404.1512, 416.912 ("In general, you have to prove to us that you are . . . disabled . . . This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairments."); Drouin, 966 F.2d at 1257. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (placing burden of production on claimant). "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001). Here, ample evidence concerning plaintiff's mental limitations was contained in the record to allow the ALJ to determine if plaintiff suffered from a disabling mental condition; that evidence was appropriately evaluated by the ALJ. There was no requirement in these circumstances that the ALJ seek out additional records not presented by plaintiff. Accordingly, remand is not warranted.

/

**B.   SIDE EFFECTS OF MEDICATION**

Plaintiff asserts that the ALJ failed to consider the side effects caused by her medications, which, according to a guide to prescription drugs, cause drowsiness. Joint Stipulation, at 8-9. Plaintiff in the Joint Stipulation points to no specific references in the record revealing any drowsiness caused by her medications. Defendant found limited references to drowsiness provided by plaintiff in her Disability Report [AR at 179, 181] and in March, 2001, where she indicated at the Rio Hondo Center that her morning dose of medication made her feel drowsy. [AR at 395.] Joint Stipulation, at 9, fn. 1.

The Court rejects plaintiff's arguments. As discussed above, plaintiff shoulders the burden of producing evidence of disability. She offered no testimony about the side effects of her medications, and the medical evidence in the record suggests that no side effects were being experienced by her. [See AR at 387, 388, 390-92 (no side effects noted).] Morever, to accept plaintiff's few claims of disabling side effects, as they all came from plaintiff herself, the ALJ would have to find plaintiff credible. See 20 C.F.R. §§ 404.1529, 416.929 (permitting the evaluation of, among other things, inconsistencies in the evidence, and conflicts between a claimant's statements and the rest of the evidence, to determine the extent to which symptoms affect capacity to work). Here, the ALJ found that plaintiff's "statements regarding her pain and other symptoms concerning her established impairments are not persuasive or credible" to the extent she says she cannot work. [AR at 16.] The ALJ's credibility findings were properly supported, and are entitled to deference.

Whenever an ALJ's disbelief of a claimant's testimony is a critical factor in a decision to deny benefits, the ALJ must make explicit credibility findings. Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990); see Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (implicit finding that claimant was not credible is insufficient); see also Lester, 81 F.3d at 834 (the ALJ must provide clear and convincing reasons for discrediting a plaintiff's testimony as to severity of symptoms when there is medical evidence of an underlying impairment). Indicia of unreliability upon which an ALJ may rely to reject plaintiff's subjective complaints include: (a) activities inconsistent with a finding of a severe impairment; (b) discrepancies in plaintiff's statements; (c) exaggerated complaints; and (d) an unexplained failure to seek treatment. See Fair v. Bowen, 885 F.2d 597,

603-04 (9th Cir. 1989) ("if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working."). If properly supported, the ALJ's credibility determinations are entitled to "great deference." Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986).

The reasons provided by the ALJ to reject plaintiff's credibility were clear and convincing, and supported by the record. The ALJ noted plaintiff's "drug seeking history of illegal substances" [see AR at 218, 465, 486-87], that she admitted seeking work and working after her onset date [see AR at 388-91, 557-60], and her challenge to a hospital report of amphetamine use,[7] despite her admission that her problems were attributable to amphetamine use. [AR at 466, 472, 584.] These reasons to reject plaintiff's credibility serve to render remand unnecessary to address side effects that were only minimally alleged by plaintiff alone, and are contradicted by evidence in the record.

## C. FAILURE TO CONSIDER LAY TESTIMONY

Plaintiff contends that the ALJ erred in not discussing the evidence provided in a third-party questionnaire submitted by plaintiff's friend, Dave Hardin, on February 28, 2002. Joint Stipulation, at 12-13. In the questionnaire, Mr. Hardin wrote that plaintiff generally spends a typical day "fighting with everyone she is around," that she has insomnia when she is not using medication, that "[t]alking with others is very stressful" for plaintiff and that "fighting erupts" in such situations, that she has trouble concentrating and remembering things, and that she "appears to be unable to function in society in a manner that would allow her to be financially self sufficient." [AR at 150-55.] On the other hand, Mr. Hardin also commented that plaintiff does not have any difficulties in caring for her personal needs, her grooming habits have not changed since she became ill, she prepares and cooks her own meals without assistance, she does all her own shopping and pays

---

[7] Plaintiff testified that she had been clean of amphetamines since 1997, and a positive test in July, 2003, was a result of over-the-counter medication. [AR at 563.]

12

her own bills, and she takes care of the household chores. Mr. Hardin also reported that plaintiff's children and pets are dependent on her for their care, she attends church and other functions on a regular basis, and she has very little trouble following instructions or finishing jobs. [AR at 150-55.] The ALJ did not mention Mr. Hardin's statements in her decision.

As stated in 20 C.F.R. §§ 404.1513(d) and 416.913(d), judges may, "in addition to evidence from the acceptable medical sources . . . also use evidence from other sources to show the severity of [plaintiff's] impairment(s) and how it affects [her] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d) (2005). Such other sources include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Thus, lay witness testimony by friends and family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider. Sprague v. Bowen, 812 F.2d 1226, 1231-32 (9th Cir. 1987); see Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) ("[a]n eyewitness can often tell whether someone is suffering or merely malingering.... [T]his is particularly true of witnesses who view the claimant on a daily basis..."). An ALJ's consideration of lay testimony becomes especially important when a plaintiff alleges "that pain is a significant factor of his alleged inability to work and the allegation is not supported by objective medical evidence in the file." SSR[8] 88-13; see Smolen, 80 F.3d at 1288. To reject lay testimony, an ALJ must give reasons "germane to each witness" for doing so. Dodrill, 12 F.3d at 919.

The ALJ, however, "does not need to meet the impossible burden of mentioning every piece of evidence" presented to her. Parks v. Sullivan, 766 F.Supp. 627, 635 (N.D. Ill. 1991). As long as substantial evidence supports the ALJ's conclusion and the ALJ explains why "significant probative evidence has been rejected," an ALJ's failure to discuss lay witness testimony constitutes harmless error. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984). In Vincent,

---

[8] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

13

although the ALJ did not discuss the plaintiff's son's testimony in his hearing decision, the court held that such an omission did not require reversal because the medical evidence supported the ALJ's decision that the plaintiff was not disabled. Id.

The view that an ALJ need not discuss every piece of evidence, even when that evidence is from a lay witness, has found support in the Seventh and Eighth Circuits, especially when lay witness testimony does little more than corroborate a plaintiff's own testimony. In Books v. Chater, a Seventh Circuit decision, the court held that "[a]ll we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'" Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (quoting Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985)). Since plaintiff's brother's testimony in Books "did not constitute a separate 'line of evidence,'" but "served strictly to reiterate, and thereby corroborate, [plaintiff's] own testimony concerning his activities and limitations" -- and the plaintiff's testimony was found by the ALJ to be "untenable" when contrasted with his daily activities and the medical evidence -- the court held that the ALJ's failure to specifically discuss the plaintiff's brother's testimony was not error. Books, 91 F.3d at 980. Similarly, in Young v. Apfel, the Eighth Circuit held that "[a]lthough specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal" as long as the ALJ's "ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). In Young, since the same evidence the ALJ used to discount the plaintiff's testimony "also support[ed] discounting the testimony of [the plaintiff's] husband," the court held that "the ALJ's failure to give specific reasons for disregarding [the husband's] testimony [was] inconsequential." Id.

Any error by the ALJ in this case by not discussing Hardin's testimony was harmless for a number of reasons. First, as seen above, substantial evidence supports the ALJ's conclusion that

plaintiff's mental impairment is not disabling.[9] Her 1997 and 2003 hospitalizations occurred when she was not taking her medications. When she takes her medications, they are described as helpful and effective. Both a psychiatrist and the lay witness note that plaintiff can care for herself, do household chores, cook and run errands. An examining psychiatrist, state agency physician, and testifying expert all concluded that plaintiff can follow simple instructions and/or perform simple repetitive tasks, albeit without much public contact. Second, Mr. Hardin's testimony was neither significant nor probative, and added little, if anything, to the record. At the hearing, plaintiff testified that she had not worked since October, 2001. [AR at 560.] Plaintiff indicated that she always feels she is mildly depressed, but her depression becomes more severe when she's feeling a lot of stress. [AR at 561-62.] Her medication "helps some," and prevents the episodes of depression from becoming severe and frequent. [AR at 562.] When she is taking her medications, her symptoms of depression range from mild to moderate. [AR at 570.] In addition to her depressive episodes, she is prevented from working by anxiety, poor concentration and difficulty remembering instructions. [AR at 563.] Plaintiff indicated that as of the beginning of 2003, she had difficulty following simple instructions and not remembering what she was told. [AR at 575-76.]

Plaintiff did not testify to any difficulties she had fighting with others, and she points to nothing in the record other than Mr. Hardin's statement to indicate that this is a problem for her. It is thus not supported by the evidence. Plaintiff's inability to concentrate and remember things was testified to by plaintiff -- Mr. Hardin's statements in this regard add nothing to the record. Further, no evidence was even submitted concerning how much time Mr. Hardin spends with plaintiff, and what position he is in to comment on her activities. Even assuming that Mr. Hardin sees plaintiff daily, however, Mr. Hardin's statements are not at all inconsistent with the conclusions reached by the ALJ. The main limitations to be gleaned from the lay witness' statements are that plaintiff has trouble interacting with others, has trouble concentrating and

---

[9] Plaintiff does not specifically challenge in the Joint Stipulation the ALJ's findings that her physical impairments do not render her disabled. The issues presented by plaintiff in the Joint Stipulation relate to her mental impairment, and/or the side effects of certain medications. The Court thus limits its discussion to these issues.

remembering, but has very little trouble in following instructions or finishing a job. The ALJ limited plaintiff to simple, repetitive tasks with no public interaction. These restrictions account for the limitations mentioned by the lay witness.

While lay witness testimony should generally not be ignored without comment, an ALJ's failure to explain his rejection of such testimony constitutes harmless error when that testimony does little more than corroborate plaintiff's testimony and adds nothing of substance to the record, as is the case with Mr. Hardin's testimony. See 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 88-13; Books, 91 F.3d at 980; Vincent, 739 F.2d at 1395. The ALJ's decision must be upheld in these circumstances.

## VI.
## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that: 1. plaintiff's request for remand is **denied**; and 2. the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

DATED: September 27, 2005

                                                             /S/
                                    PAUL L. ABRAMS
                        UNITED STATES MAGISTRATE JUDGE